## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

**SILVESTRE REYES-FILICIANO,**

      **Plaintiff,**

**v.**                               **Civil Action No. 1:18cv76**
                                             **(Judge Kleeh)**

**UNITED STATES OF AMERICA,**

      **Defendant.**

## REPORT AND RECOMMENDATION

### I. Procedural History

On April 20, 2018, the *pro se* Plaintiff, an inmate then-incarcerated at USP Coleman I, in Coleman Florida,[1] initiated this case by filing a complaint pursuant to the Federal Tort Claims Act ("FTCA"). ECF No. 1. Along with his complaint, Plaintiff filed a motion to proceed as a pauper with supporting documents. ECF Nos. 2, 3, 4. By separate Orders entered April 24, 2018, Plaintiff was granted permission to proceed as a pauper and directed to pay an initial partial filing fee ("IPFF"), and was directed to file copies of his administrative tort claim letters.  ECF Nos. 6, 7. On May 10, 2018, Plaintiff filed a response, attaching a copy of a claim form; an acknowledgment letter; and a letter from him to regional counsel regarding counsel's failure to respond.  ECF No. 11.

Plaintiff paid his IPFF on May 24, 2018. ECF No. 12.  On November 14, 2018, Plaintiff moved for appointed counsel. ECF No. 20. By Miscellaneous Case Order entered on November 30, 2018, this case was reassigned from Senior District Judge Irene M. Keeley to District Judge Thomas S. Kleeh. ECF No. 22. Plaintiff filed a Notice of Change of Address on January 15, 2019.

---

[1] Plaintiff is presently incarcerated at FCI Victorville Medium I, in Adelanto, California.

ECF No. 24. By Order entered March 20, 2019, Plaintiff's motion for appointed counsel was denied. ECF No. 25.  That same day, August 30, 2017, the undersigned conducted a preliminary review of the file; determined that summary dismissal was not appropriate at that time; and directed the Clerk to issue summonses and forward copies of the complaint to the United States Marshal Service ("USMS") for service of process. ECF No. 26.

On May 17, 2019, the Defendant moved for an extension of time in which to respond. ECF No. 31. By Order entered May 20, 2019, the Defendant was granted the extension. ECF No. 32. On June 17, 2019, the Defendant moved for a second extension; by Order entered June 18, 2019, the second extension was granted. ECF Nos. 34. 35. On July 24, 2019, the Defendant filed a Motion to Dismiss or in the Alternative, Motion for Summary Judgment with a memorandum in support, attaching several sworn declarations and other exhibits. ECF Nos. 37, 38. Because Plaintiff was proceeding *pro se*, on July 29, 2019, a <u>Roseboro</u> Notice was entered.  ECF No. 39. On September 20, 2019, Plaintiff moved for an extension of time in which to respond. ECF No. 42. By Order entered September 24, 2019, Plaintiff's motion for an extension of time to respond out of time was granted. ECF No. 43.

On October 21, 2019, Plaintiff moved Plaintiff filed a Motion for Continuance to Conduct Discovery Necessary to Oppose . . . Defendant's Motion to Dismiss, or in the Alternative, for Summary Judgment and Supporting Memorandum. ECF No. 46. On November 5, 2019, the Defendant filed a response in opposition to Plaintiff's motion to continue the case to conduct discovery. ECF No. 47. By Order entered  November 7, 2019, Plaintiff's motion for a continuance to conduct discovery was denied in part as to the continuance and granted in part as to Plaintiff's request that a copy of the surveillance video be reviewed *in camera* by the Court; the Defendant was directed to produce a copy of any/all video footage of the November 24, 2015 incident within

2

10 days from the date of the Order. ECF No. 48. On November 15, 2019, the Defendant sent a copy of an encrypted DVD containing the available security footage for the November 24, 2015 incident to the Clerk of Court for forwarding to the undersigned. On November 25, 2019, Plaintiff filed his response in opposition to the Defendant's dispositive motion. ECF No. 50. On December 9, 2019, the Defendant replied. ECF No. 51.

This case is before the undersigned for an initial review pursuant to LR PL P 2.

## II. The Pleadings

### The Complaint

Plaintiff's complaint raises claims of negligence and/or intentional use of excessive force and assault and battery, arising out of a November 24, 2015 incident at FCI Hazelton, wherein he alleges he was "savagely beaten" and kicked all over, including in the face and head, by a number of guards after he was already cuffed, lying on the floor as directed, and no longer resisting.  ECF No. 1 at 6. He contends that after the beating, he was placed in a Special Housing Unit ("SHU") cell for 4 hours without receiving any medical care for his injuries, until he was transferred to FCI Cumberland, where he was immediately sent to an outside hospital for treatment. Id. at 6 – 7.

He alleges that the injuries he sustained include, but may not be limited to, two fractured ribs, head trauma, including swelling and bruising of the ear and face; and a hemorrhage of the right eye. He contends that he now requires medications for high blood pressure, anxiety, and pain, and needs ophthalmology treatment and glasses for his eye injury. Id.

Plaintiff admits that he was later criminally charged for assaulting Michael Shreves, one of the officers involved, and also administratively charged with two Bureau of Prisons ("BOP") disciplinary code ("DC") violations: a 107 and a 307, "later downgrade[d] to a DC#224, and

summarily found guilty of DC . . . 224/307, that resulted in the loss of good time credit, etc." <u>Id.</u> at 7.

Plaintiff avers that he filed an Administrative Tort Claim Form SF95 on July 18, 2017, and received an acknowledgement on July 25, 2017. <u>Id.</u> at 4. His claim was assigned the number TRT-MXR-2017-0576.

As relief, he seeks $6,514,000.00 in damages, pre- and post-judgment interest, and costs. <u>Id.</u> at 4, 8.

## B. <u>Defendant's Motion to Dismiss, or in the Alternative, Motion for Summary Judgment</u>

Defendant contends that the complaint should be dismissed or summary judgment granted in its favor as to Plaintiff's claim of negligence arising out of the November 24, 2015 incident because Plaintiff cannot establish that any duty of care owed to him was breached and Plaintiff's claims to the contrary are without merit. Further, any claim for an intentional tort arising out of the November 24, 2015 incident must also be dismissed, because the United States cannot be sued when a federal law enforcement officer intentionally assaults or batters another person and BOP officers are federal law enforcement officers. Moreover, Plaintiff cannot prove the necessary intent to prove assault and battery under West Virginia law. Defendant describes Plaintiff's claims as "nothing more than conclusory and self-serving statements to attempt to prove that BOP staff had the necessary intent to commit an assault or battery." ECF No. 38 at 6 – 10.

## C. <u>Plaintiff's Response in Opposition</u>

Plaintiff contends that his inability to conduct discovery hampers his ability to provide the Court with evidence to refute the Defendant's arguments. He reiterates his claim that he was already handcuffed and lying face down on the floor as directed when he was beaten in a "mob action" by BOP staff. He contends that he has had to go through "multiple operations" to repair

4

his eye socket, and that he was treated "for damage done to . . . [my] ribs" and for psychological damage.   He admits that he assaulted a BOP employee, but argues that the force that BOP staff used in response was excessive, given that he was unable to resist, and it violated his Eighth Amendment rights. Other than an attempt to refute the Defendant's contention that his injuries were found to be non-existent at FCI Hazelton, by arguing that FCI Hazelton's medical staff's exam was cursory, incompetent, and incomplete, because it failed to discover his serious injuries, Plaintiff does not address any of the arguments in the Defendant's dispositive motion.

However, Plaintiff does include a new prayer for relief, now seeking injunctive relief in the form of a declaration that the BOP's staff violated his rights under the Constitution and laws of the United States; he also requests compensatory damages of $250,000.00 from "each defendant jointly and severally" and punitive damages from "each defendant, jointly and severally." He also requests a jury trial, and recovery of his costs. ECF No. 50 at 1 – 5.

### D. **Defendant's Reply**

Defendant reiterates its arguments regarding the discovery requested by Plaintiff, noting that it has provided a copy of what video footage was available.[2] Further, it notes that Plaintiff's response admits having assaulted a BOP employee; while it concedes that such would not justify the use of excessive force, it notes that this admission contradicts Plaintiff's complaint's original representation that implied that Plaintiff was only involved in a "physical confrontation" with Shreves. Finally, Defendant notes that Plaintiff's response completely failed to address any of the arguments in its memorandum in support of its dispositive motion, and now asserts an Eighth Amendment claim which was not pled in the complaint.

---

[2] In the November 13, 2019 cover letter to the undersigned, enclosed with the DVD of the available security footage of the November 24, 2015 incident, Defendant notes that "[a]s the incident took place after Plaintiff assaulted the Counselor in his office, the security cameras did not record footage of the actual incident, but the security cameras did record the Plaintiff entering and being escorted out of the office area."

Defendant reiterates its claim that the complaint should be dismissed because Defendant did not breach any duty to Plaintiff, and Plaintiff has not pled and cannot establish a cognizable assault or battery claim against Defendant. ECF No. 51 at 1 – 2.

### III. Standard of Review

#### A. Motion to Dismiss 12(b)(1)

In ruling on a motion to dismiss under Rule 12(b)(1), no presumptive truthfulness attaches to the plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims.  See Materson v. Stokes, 166 F.R.D. 368, 371 (E.D. Va. 1996). Instead, the burden of proving subject matter jurisdiction on a Rule 12(b)(1) motion to dismiss is on the party asserting federal jurisdiction. A trial court may consider evidence by affidavit, deposition, or live testimony without converting the proceeding to one for summary judgment. Adams v. Bain, 697 F.2d 1213, 1219 (4th Cir. 1982); Mims v. Kemp, 516 F.2d 21 (4th Cir. 1975). Because the court's very power to hear the case is at issue in a Rule 12(b)(1) motion, the trial court is free to weigh the evidence to determine the existence of its jurisdiction. Whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action.  See Fed.R.Civ.P. 12(h)(3).

#### B. Motion to Dismiss 12(b)(6)

Rule 12(b)(6) of the Federal Rules of Civil Procedure permits dismissal of a case when a complaint fails to state a claim upon which relief can be granted. The Federal Rules of Civil Procedure require only "'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007) (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)). Courts long have cited "the accepted rule that a complaint

should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley, 355 U.S. at 45-46.

Plaintiff is proceeding *pro se* and therefore the Court must liberally construe his pleadings. Estelle v. Gamble, 429 U.S. 97, 106 (1976); Haines v. Kerner, 404 U.S. 519, 520 – 21 (1972) (*per curiam*); Erickson v. Pardus, 551 U.S. 89, 94 (2007). While *pro se* pleadings are held to a less stringent standard than those drafted by attorneys, even under this less stringent standard, a *pro se* complaint is still subject to dismissal. Haines, *supra* at 520–21. "[T]he mandated liberal construction afforded to *pro se* pleadings 'means that if the court can reasonably read the pleadings to state a valid claim on which the petitioner could prevail, it should do so.'" Barnett v. Hargett, 174 F.3d 1128, 1133 (10th Cir. 1999). However, "judges are [] not required to construct a party's legal arguments for him." Small v. Endicott, 998 F.2d 411, 417 – 8 (7th Cir. 1993).

Although a complaint need not contain detailed factual allegations, a plaintiff's obligation in pleading "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do . . ." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007). Accordingly, "[f]actual allegations must be enough to raise a right to relief above the speculative level," to one that is "plausible on its face." Id. at 555, 570. In Twombly, the Supreme Court found that "because the plaintiffs [] have not nudged their claims across the line from conceivable to plausible, their complaint must be dismissed." Id. at 570. Thus, to survive a motion to dismiss, a plaintiff must state a plausible claim in his complaint which is based on cognizable legal authority and includes more than conclusory or speculative factual allegations.

"[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009). Thus, "[t]hreadbare recitals of the elements of a cause

of action, supported by mere conclusory statements, do not suffice," because courts are not bound to accept as true a legal conclusion couched as a factual allegation. Id. at 678. "[D]etermining whether a complaint states a plausible claim . . . [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id. at 679. Thus, a well-pleaded complaint must offer more than "a sheer possibility that a defendant has acted unlawfully," in order to meet the plausibility standard and survive dismissal for failure to state a claim. Id. at 678.

"A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding facts, the merits of a claim, or the applicability of defenses." Republican Party of North Carolina v. Martin, 980 F.2d 943, 952 (4th Cir. 1992) (citing 5A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1356 (1990)). In considering a motion to dismiss for failure to state a claim, a plaintiff's well-pleaded allegations are taken as true and the complaint is viewed in the light most favorable to the plaintiff. Mylan Labs, Inc. v. Matkari, 7 F.3d1130, 1134 (4th Cir. 1993); see also Martin, 980 F.2d at 952.

"Ordinarily, a court may not consider any documents that are outside of the complaint, or not expressly incorporated therein, unless the motion is converted into one for summary judgment." Alternative Energy. Inc. v. St. Paul Fire and Marine Ins. Co., 267 F.3d 30, 33 (1st Cir. 2001) (cited with approval in Witthohn v. Federal Ins. Co., 164 Fed. Appx. 395 (4th Cir. 2006) (unpublished)). There are, however, exceptions to the rule that a court may not consider any documents outside of the complaint. "Courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular documents incorporated into the complaint by reference, and matters of which a court

may take judicial notice." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322, 127 S.Ct. 2499, 2509 (2007).

## C. **Motion for Summary Judgment**

Pursuant to Federal Rule of Civil Procedure 56(a), the Court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." In applying the standard for summary judgment, the Court must review all the evidence in the light most favorable to the nonmoving party. Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986). However, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

In Celotex, the Supreme Court held that the moving party bears the initial burden of informing the Court of the basis for the motion to, "demonstrate the absence of a genuine issue of material fact." Celotex, 477 U.S. at 323. Once "the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

"The movant has the burden of showing that there is no genuine issue of fact, but the plaintiff is not thereby relieved of his own burden of producing in turn evidence that would support a verdict." Anderson, *supra* at 256. Thus, the nonmoving party must present specific facts showing the existence of a genuine issue for trial, meaning that "a party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but must set forth specific facts showing that there is a genuine issue for trial." Id. The "mere existence

of a scintilla of evidence" favoring the nonmoving party will not prevent the entry of summary judgment. Id. at 248.

To withstand such a motion, the nonmoving party must offer evidence from which a "fair-minded jury could return a verdict for the [party]." Id. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Felty v. Graves-Humphreys Co., 818 F.2d 1126, 1128 (4th Cir. 1987). Such evidence must consist of facts which are material, meaning that they create fair doubt rather than encourage mere speculation. Anderson, *supra* at 248.

Summary judgment is proper only "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." Matsushita, *supra* at 587. "Where the record as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Id. *citing* First Ntl. Bank of Ariz. v. Cities Service Co., 391 U.S. 253, 289 (1968). See Miller v. Fed. Deposit Ins. Corp., 906 F.2d 972, 974 (4th Cir. 1990). Although any permissible inferences to be drawn from the  underlying facts must be viewed in the light most favorable to the party opposing the motion, where, the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, disposition by summary judgment is appropriate. Matsushita, *supra* at 587-88; Anderson, *supra* at 248-49.

## IV. Analysis

### A. Factual History

There appears to be no dispute that on November 24, 2015, at around 7:45 a.m., while incarcerated at FCI Hazelton, the Plaintiff entered the office of M-4 Unit Counselor Michael Shreves ("Shreves") and struck Shreves with his fist in the facial area. See Complaint, ECF No. 1

at 6; see also Declaration of Kevin Kelly, Executive Assistant, FCI Welch,[3] ("Kelly Decl."), ECF No. 38-2, ¶ 4 at 2 -3; Declaration of Justin Handlin, Cook Supervisor, FCC Hazelton ("Handlin Decl."), ECF No. 38-3, ¶ 4 at 2 - 3.

Plaintiff's complaint contends that he "entered into an argument" that day with Shreves, who used racist, offensive, and abusive language when ordering Plaintiff to move to a cell with an inmate Plaintiff did not get along with, and that the argument ended in "a physical confrontation" where Plaintiff was handcuffed and ordered to lie on the floor.  ECF No. 1 at 6.  Plaintiff avers that he was then dragged to the end of Shreves' office by Shreves and others, where he was then "savagely beaten, kicked[] in the face, head, and all over . . .[the] body[] for an extended period of time." Id. He maintains he was "defenseless . . .[and] partially unconscious" during this time and offered no resistance. Id. Plaintiff asserts that he was then taken to the SHU and left there for four hours without being given any medical attention for his injuries until he was transferred to FCI Cumberland. Id. He asserts that upon arrival there, when he was examined by medical staff, he was immediately sent to a nearby hospital where he was treated "for around 36 hours" for "various lesions," including two broken ribs, head trauma, face and ears swollen and bruised, and a right eye hemorrhage. Id. at 6 – 7.

Plaintiff admits that he was later criminally charged for assaulting Michael Shreves, one of the officers involved, and also administratively charged with two BOP disciplinary code violations: a 107 and a 307, "later downgrade[d] to a DC#224, and summarily found guilty of DC . . . 224/307, that resulted in the loss of good time credit, etc."  Id. at 7.

---

[3] Kelly was formerly employed as the Deputy Captain at FCC Hazelton from May 17, 2015 to November 12, 2016. See Kelly Decl., ECF No. 38-2, ¶ 1 at 2. As Deputy Captain, Kelly reviewed memoranda regarding the use of force in Plaintiff's case. Id., ¶ 4 at 2.

Conversely, the BOP records indicate that Plaintiff after Plaintiff struck Shreves, Plaintiff refused BOP staff's verbal commands to lie on the ground; therefore, a staff member had to activate his body alarm. Kelly Decl., ¶4 at 3. Justin Handlin was one of the staff who responded. Handlin Decl., ¶ 4. Upon arrival, Handlin observed Shreves, covered in blood. Id.  BOP staff who responded immediately placed Plaintiff on the ground to gain control of him. Kelly Decl., ¶ 4 at 3. Even while on the ground, Plaintiff continued to assault and resist BOP staff. Id.; see also Handlin Decl. ¶ 4 at 2. Plaintiff continued to display signs of imminent violence by threating to assault staff. Kelly Decl., ¶ 4 at 3; Handlin Decl., ¶ 4 at 2. Based on Plaintiff's behavior, BOP staff placed Plaintiff in an escort chair and transported him to the SHU. Kelly Decl., ¶ 4 at 3; see also Handlin Decl., ¶4 at 2. Plaintiff continued to display signs of imminent violence by threatening to assault staff, once his hand restraints were removed; therefore, he was placed in ambulatory restraints until he could regain control of his emotions and the signs of imminent violence subsided. Kelly Decl., ¶ 4 at 3; see also Handlin Decl., ¶ 4 at 2. BOP staff who responded to the active body alarm restrained Plaintiff with the minimal force necessary. Handlin Decl., at ¶ 5.

At 9:56 a.m., medical staff at the Federal Correctional Complex at Hazelton ("FCC Hazelton") conducted an injury assessment of Plaintiff. Declaration of Brett Friend, FCC Hazelton Health Services Administrator ("Friend Decl."), at ¶ 7; see also BOP Health Services Clinical Encounter, ECF No. 38-4 at 6.  Plaintiff did not report any symptoms to FCC Hazelton medical staff at that time.  Friend Decl. at ¶ 7.  Plaintiff  rated his pain as a zero (0) and appeared alert and oriented. Id.  FCC Hazelton medical staff noted  Plaintiff had superficial abrasions to his scalp, left eye, and a contusion behind his right ear. Id. FCC Hazelton medical staff observed no other injuries when they evaluated Plaintiff. Friend Decl., ¶ 7 at 3; Handlin Decl., ¶ 4 at 2 – 3.

12

Because it is the BOP's standard practice to transfer inmates who have assaulted BOP staff at one institution to another institution for the safety and security of the inmate and staff, after Plaintiff struck Shreves, Plaintiff was transferred to FCI Cumberland (Maryland) later that day. Kelly Decl., ¶ 5 at 3; see also Declaration of Howard Williams, Legal Assistant, BOP Mid-Atlantic Regional Office (Williams Decl."), ECF No. 38-1, ¶ 5 at 3.

On April 5, 2016, as a result of the incident that occurred on November 24, 2015, Plaintiff was indicted in the United States District Court for the Northern District of West Virginia in Case No. 1:16cr20 on one count of Assault on a Federal Employee Resulting in Injury, in violation of 18 U.S.C. § 111(a)(1) and (b).[4] See Case No. 1:16cr20, ECF No. 1. On August 2, 2016, Plaintiff pled guilty and was sentenced to eighteen (18) months of incarceration, to be served consecutively to the federal sentence he was already then serving.[5] See Case No. 1:16cr20, ECF No. 19.

Plaintiff was also charged with committing prohibited acts in violation of BOP disciplinary policy through Incident Report No. 2828402.[6] See Discipline Hearing Officer Incident Report

---

[4] The "Offense Conduct" in Plaintiff's PreSentence Investigation Report ("PSR") describes the incident:

> On November 24, 2015 at 7:45 a.m., Silvestre Reyes-Filiciano an inmate at FCI Hazelton intentionally punched Counselor Michael Shreves in the face with his closed fists. Reyes was upset with Counselor Shreves, purportedly, because he was being moved to a different cell. Counselor Shreves was engaged in the performance of his official duties at the time of the assault. Other staff members responded to the incident and placed Reyes-Filiciano on the ground. Reyes-Filiciano continued to resist staff members, continued to be violent, and continued threatening staff members. Counselor Shreves sustained a bodily injury in the form of a contusion to his lower lip.

See PSR, ECF No. 20 at 1, United States v. Reyes-Filiciano, Case No. 1:16cr20 (N.D. W.Va. 2016).

[5] On January 21, 2010, in Case No. 1:08cr01412-003BB in the United States District Court for the District of New Mexico, Plaintiff was sentenced to an aggregate term of 322 months imprisonment to be followed by a 5 year term of supervised release, based on convictions for "Possession with Intent to Distribute 500 Grams or More of Methamphetamine" in violation of 18 U.S.C. § 841(B)(1)(A); "Conspiracy to Violate 21 U.S.C. § 841(B)(1)(A)" in violation of 21 U.S.C. § 846; and Carrying a Firearm During and in Relation to a Drug Trafficking Crime, in violation of 18 U.S.C. § 924(C)(1)(A). See Williams Decl.¶ 4; Sentry Public Inmate Data, ECF No. 38-1 at 7.

[6] There is a typographical error in the date of incident in the Incident Report; it erroneously states that the date the incident occurred was November 24, 2016, when the incident actually occurred on November 24, 2015. See ECF No. 38-5 at 2.

("Incident Report"). ECF No. 38-5 at 2.  These charges were heard by a Discipline Hearing Officer

("DHO") on September 7, 2016.[7]  Id.

> Shreve's statement in the Incident Report asserted that:
>
> On the above date and approximate time Inmate Reyes-Filiciano . . . entered my
> office and without warning struck me in my mouth with a closed fist. I immediately
> ordered Reyes to lie on the ground to which he refused and [I] activated my body
> alarm. As responding staff arrived[,] Reyes was placed on the ground to gain control
> of his actions. While on the ground[,] Reyes continued to resist staffs [sic] efforts to
> place him into hand restraints by pulling away.

ECF No. 38-5 at 3 – 4.

> A summary of Plaintiff's statement at the hearing is contained in the Incident Report:
>
> Inmate Reyes-Filiciano acknowledged receiving a copy of the incident report and
> stated he understood his rights before the DHO. **The DHO read aloud Section 11
> of the Incident Report and asked inmate . . . if the report was true**. **Inmate . . .
> stated** "the officer is racist. He didn't like the Mexicans. He would never do his job
> for us. **I did hit him in the mouth** because he wouldn't move me cells. He was
> disrespectful to me and said "what did you want you f-----g Mexican, you're a piece
> of s—t." I tried to leave the office and he was in my way.  I didn't actually punch
> him, I pushed him out of the way."

ECF No. 38-5 at 2 (emphasis added).

As indicated in Defendant's cover letter to the undersigned with the DVD of surveillance

footage, a review of the same does not reveal the inciting incident itself which occurred inside of

Shreves' office, where Plaintiff was subdued by BOP staff after striking Shreves.  There are eight

separate views;[8] six of them are merely different views of the M4 unit; one is of the "Outer

---

[7] Based on the evidence, including the Incident Report, the DHO found that the Plaintiff committed the prohibited act
of assaulting any person (minor), Code 224, and refusing to obey an order, Code 307. Plaintiff was disciplined with
the loss of 27 days good conduct time; forfeiture of 27 days of non-vested good conduct time; 30 days of disciplinary
segregation; 180 days loss of commissary; and 180 days lost of phone for the Code 224 violation, and with the loss of
180 days visitation for the Code 307 violation. ECF No. 38-5 at 2 – 4.

[8] The views are labeled FCI-10_145-160 - 153 M4 Outer Sallyport ("Outer Sallyport"); FCI-10_145-160 – 154 M4
Inner Sallyport ("Inner Sallyport"); FCI-10_145-160 – 155 M4 DR l("DR 1"); FCI-10_145-160 – 156 M4 DR 2 ("DR
2"); FCI-10_145-160 – 157 M4 DR 3 ("DR 3"); FCI-10_145-160 – 158 M4 DR 4 ("DR 4"); FCI-10_145-160 – 159
M4 DR 5 ("DR 5"); and FCI-10_145-160 – 160 M4 DR 6 ("DR 6").

Sallyport," an outside porch that appears to be enclosed by metal mesh on both sides and leads to an outer set of stairs exiting the cellblock.  One view is of the "Inner Sallyport," which shows the area on the opposite side of the door that leads to the "Outer Sallyport." There is no sound in any of the videos.  Most views do not show Plaintiff or Counselor Shreves' office doorway, because of the vantage point at which the cameras are situated.

It appears that the incident must have occurred at around 7:41 a.m. or shortly before, because prior to that time, all views of the M4 unit first floor common area and the first and second floor tiers of cells and walkways show a casual scene: numerous prisoners coming and going, chatting and visiting amongst themselves, and/or standing around, until suddenly, a guard appears, and then more guards quickly appear, all of whom appear to be gesturing to and directing the inmates; the inmates all quickly gather their belongings, if any, and disperse, presumably returning to their cells, until all areas of the unit, including the upper/lower tiers, and common area are vacant of prisoners and are patrolled only by BOP staff.

The only views in which Plaintiff is visible at all are the Outer Sallyport; Inner Sallyport; DR 1; DR 4; and DR6.[9] The view with the clearest, closest images of Plaintiff is Inner Sallyport, which, like the other views, begins at around 7:37 a.m., where, after approximately 15 – 16 minutes of footage of random BOP staff coming and going through the doorway leading to the "Outer Sallyport" porch, suddenly, at 7:53.32.925 a.m., a guard goes through the door onto the porch, stops and holds the door open for others following closely behind him: a burly guard appears, pulling backwards behind him an inmate strapped to an escort chair with his hands restrained behind him and his ankles crossed; the inmate is facing the camera.  There are also

---

[9] Views DR 2, DR 3, and DR 5 all merely show different views of the M4 unit with inmates moving around before the guards appear and direct them to leave; they do not include footage showing Plaintiff entering or leaving Shreves' office.

multiple other BOP staff members present, surrounding and behind them; all quickly pass through the doorway to the outside, followed by a female staff person carrying a bag and what appears to be several long sticks; she is stopped, holding the door, looking back inside at a couple other staff members, when the video ends at 7:53.57.327 a.m. In this view, Plaintiff is wearing a brown pull-over knit-type shirt like a sweatshirt or T-shirt, gray or khaki-colored shorts, white socks, and athletic shoes. His face is visible; his eyes are closed, his head is tilted back and lolls slightly to the right, bouncing slightly as the is chair moved, as if he were unconscious.  There are no obvious injuries or bruises, nor any apparent blood or body fluids on any visible portion of his face, legs, or clothing; however, the quality of the footage is blotchy and not always clear.

The view in Outer Sallyport also shows Plaintiff in the escort chair, being dragged backwards through the door at 7:53.42.253 a.m.; however, in that view, the upper part of Plaintiff's body and head are obscured behind the staff member pulling he chair; his lap is briefly visible, but no determination of his condition can be made.

In view DR 1, a long view of the common area of the M4 unit is visible, along with the stairs to the second tier on the left side of the screen; the second tier cells extend all the way to the far end of the screen where it turns right and continues.  In the far left corner, on the first floor, at around 7:41.18 a.m., an inmate who is dressed similarly to Plaintiff enters a doorway on the left. At 7:41.39.659 a.m., a guard comes running down the common area, headed for that same doorway.  Other guards quickly follow, and then multiple guards arrive and appear to direct the inmates to leave the area. By 7:43.41.84 a.m., no inmates can be seen anymore and the entire M4 unit is being patrolled by guards; a cluster of them are gathered around the doorway in the far left corner. At 7:53.22.217 a.m., a large group of BOP staff head away from that door, walking toward the camera; they are grouped so closely together, it cannot be said with certainty, although

16

from context and comparison with the other views, it appears that Plaintiff is being pulled behind one of them in the escort chair. However, the distance from the camera is so great and the footage so blurry, Plaintiff cannot be identified. The entire group heads out a door just before the stairs to the second story tier at 7:53.38.818 a.m.; upon review of the other videos, it is likely that this is the entrance to the "Sallyport" areas.

In View DR 4, the footage beings at 7:37 a.m. with a different view of the M4 unit; the stairs to the second floor cells are not visible, but the same scene of inmates casually going about their business is shown. At 7:41 a.m., a guard comes in quickly and goes into a room near the left corner on the lower level. By 7:42.16.612 a.m., other guards have also appeared and gone into the same room; the door to the room remains open, but because of the distance and clarity of the footage, no clear image from within can be seen. Inmates in the area start to leave; gradually all inmates have dispersed. At 7:51.39.507 a.m., more staff arrive from the left, including a guard who is wheeling an empty orange restraint chair. By 7:53.20.758 a.m., Plaintiff is brought out of the room in the restraint chair, but the footage is so blurry and distant, he cannot be seen with any clarity. The staff wheel him off toward the left of the screen and go out of sight.

In the DR 6 view, the footage begins at 7:37 a.m. with a different view of the M4 unit; the doorway to Counselor Shreves' office is not even visible from the vantage point of the camera; it is apparently further down in the bottom right, below the screen and beyond the view of the camera. The same scene of prisoners milling around occurs, until around 7:42.33.420 a.m., guards appear and the inmates quickly disperse. At 7:51.34 a.m. several BOP staff members emerge from a doorway to the right of the steps to the second tier; one of them is pushing an empty bright orange escort chair. They head forward, toward the camera, and disappear out of sight at the bottom right of the screen. At 7:53.25.421 a.m., a group of BOP staff emerge from a corner not

visible to the camera, at the bottom right of the screen, dragging Plaintiff backward in the restraint chair; because he is being dragged backward, his face is toward the camera. His arms are restrained behind his back and his ankles appear to be tightly crossed, possibly cuffed in place. Although the image is too blurry and too far away to see much detail with clarity, no obvious blood or bodily fluids can be seen on Plaintiff's clothing or on his only visible body parts: his face, knees, and lower legs, nor does he appear to have any visible injury. However, his eyes are closed; his face is expressionless; and his head is again seen, tilted and lolling to the right, and visibly bobbing with the motion of the chair being pulled, as if he might be unconscious.

None of the views of surveillance video show Plaintiff arriving in the SHU, where Defendant contends that his hand restraints were removed, and because he was still resistive, ambulatory restraints were applied. The only footage that does show Plaintiff at all ends as he is being removed from the M4 cellblock.

On July 18, 2017, Plaintiff filed an administrative tort claim seeking $6,514,000.00 for personal injury. ECF No. 11-1 at 2. The BOP acknowledged Plaintiff's claim in a letter dated July 25, 2017, assigning Administrative Claim Number TRT-MXR-2017-05716 to his claim. ECF No. 11-1 at 7. Plaintiff did not receive a denial letter; Plaintiff has attached a copy of an unsigned February 11, 2018 letter Plaintiff wrote to the BOP's Mid-Atlantic Regional Office regarding his administrative tort claim, titled "Notice of Failure to Respond," advising that because he did not receive a response, "legal action will be taken in the near future." ECF No. 11-1 at 8. Plaintiff filed this FTCA action on April 20, 2018, within the six-month statute of limitations.

**B. <u>Applicable Law</u>**

The FTCA is a comprehensive legislative scheme by which the United States has waived its sovereign immunity to allow civil suits for actions arising out of the negligent acts of agents

of the United States.  The United States cannot be sued in a tort action unless Congress has waived the government's sovereign immunity and authorized suit under the FTCA. Dalehite v. United States, 346 U.S. 15, 30-31 (1953). The provisions of the FTCA are found in Title 28 of the United States Code. 28 U.S.C. §§ 1346(b), 1402(b), 2401(b) and 2671-2680.

An inmate "can sue under the FTCA to recover damages from the United States Government for personal injuries sustained during confinement in a federal prison, by reason of the negligence of a government employee." United States v. Muniz, 374 U.S. 150 (1963). The FTCA provides at § 2674 as follows:

> The United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances, but shall not be liable for interest prior to judgment or for punitive damages.

However, the FTCA does not create a new cause of action. Medina v. United States, 259 F.3d 220, 223 (4th Cir. 2001). "The statute merely "permits the United States to be held liable in tort in the same respect as a private person would be liable under the law of the place where the act occurred." Id.

Even where the government has waived sovereign immunity, the FTCA only authorizes lawsuits against the United States itself. 28 U.S.C. § 1346(b). Therefore, the United States, not any government employee or agency is the only proper defendant in an FTCA lawsuit. See 28 U.S.C. 2679(a); Webb v. Hamidullah, 281 F. App'x 159, 161 n.4 (4th Cir. 2008) (per curiam) (unpublished) (United States is the only proper defendant in FTCA claim); Holmes v. Eddy, 341 F.2d 477, 480 (4th Cir. 1965) (per curiam) (federal agency cannot be sued pursuant to the FTCA); Allfgeir v. U.S., 909 F.2d 869 (6th Cir. 1990) ("The FTCA clearly provides that the United States is the only proper defendant in a suit alleging negligence by a federal employee").

## C. Eighth Amendment Claim of Excessive Force

A constitutional civil rights claim is not cognizable in an FTCA lawsuit. FDIC v. Myer, 510 U.S. 471, 477-79 (noting that a constitutional tort claim is not cognizable in an FTCA lawsuit because the United States has not waived its sovereign immunity with respect to constitutional tort allegations); Blanchard v. United States, No. 2:14cv58, 2015 WL 4107311, at 13 (N.D. W.Va. July 7, 2015), aff'd 622 F. App'x 287 (4th Cir. 2015) (*per curiam*) (unpublished) (finding that a civil rights claim alleging a violation of the Eighth Amendment prohibition against cruel and unusual punishment is not actionable against the United States in an FTCA lawsuit because a constitutional tort claim is not cognizable under the FTCA.

Contrary to Defendant's reply, Plaintiff's complaint and his administrative tort claim do allege that the BOP staff subjected him to excessive use of force during the incident at issue. While Plaintiff did not specifically assert an actual Eighth Amendment violation in connection with this claim until his response in opposition to Defendant's dispositive motion, liberally construed, Plaintiff's original claim does allege "intentional excessive force" was used, implicitly alleging that he suffered cruel and unusual punishment, i.e., a violation of the Eighth Amendment.

Nonetheless, here, Plaintiff elected to file an FTCA against the United States, instead of a civil rights constitutional lawsuit against individual BOP employees. Therefore, because the Plaintiff alleges that BOP staff violated his constitutional right to be free from cruel and unusual punishment, he fails to state a valid claim for relief under the FTCA.

## D. Assault and Battery Claim

Plaintiff maintains that the Defendants employees, correctional officers at FCI Hazelton, committed assault and battery on him on November 24, 2015. Because all of the alleged acts occurred in West Virginia, the substantive law of West Virginia governs this case.

Although claims of assault and battery against the United States are generally barred, the FTCA allows such claims against law enforcement officers.  <u>See</u> 28 U.S.C. § 2680(h). In West Virginia, an assault is established by showing that the defendant (1) acted intending to cause a harmful or offensive contact with the plaintiffs; or an imminent apprehension of such a contact, and (2) the plaintiff is thereby put in such imminent apprehension. <u>West Virginia Fire and Cas. Co. v. Stanley</u>, 602 S.E.2d 483, 495 (W.Va. 2004) (citing Restatement (Second) of Torts § 21 (1965)).

In addition, a person is subject to liability for battery in West Virginia if (a) he acts intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a contact, and (b) a harmful contact with the person of the other directly or indirectly results. <u>Tolliver v. The Kroger Co.</u>, 498 S.E.2d 702, 711 (W.Va. 1997) (quoting Restatement (Second) of Torts § 13 (1965)).

## 1) <u>Discretionary Function Exception to FTCA Liability</u>

The discretionary function exception is codified in subsection (a) of the statute:

> The provisions of this chapter and section 1346(b) of this title shall not apply to—
> (a) Any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

28 U.S.C. § 2680.

A District Court considering whether the discretionary function exception bars an FTCA claim must determine whether: (1) the action taken involves choice by the acting government employee or a specific course was mandated by statute, regulation or policy; and (2) the choice is "of the kind that the discretionary function was designed to shield." <u>Berkovitz by Berkovitz v.</u>

United States, 486 U.S. 531, 536 (1988). "When established governmental policy . . . allows a Government agent to exercise discretion, it must be presumed that the agent's acts are grounded in policy when exercising that discretion." United States v. Gaubert, 499 U.S. 315, 324 (1991).

Because "the United States retains its immunity for torts involving a 'discretionary function or duty' of the Government, regardless of whether or not the discretion was abused," Plaintiff cannot obtain relief for any tort alleged to have been committed by an agent who was performing such a discretionary function. Jackson v. United States, 77 F.Supp.2d 709, 713 (D. Md. 1999). Thus, Plaintiff must establish that the BOP's agents were not performing a discretionary at the time he alleges he was injured, and that the Government was not exempt from the FTCA pursuant to subsection (a).  The purpose of the discretionary function exception is to "prevent judicial second-guessing of legislative and administrative decisions grounded in social, economic, and political policy, though the medium of an action in tort." United States v. S.A. Empresa De Viacao Aerea Rio Grandense (Varig Airlines), 467 U.S. 797, 814 (1984).

The BOP has a discretionary duty of care to maintain order within its facilities pursuant to 18 U.S.C. § 4042, which provides, in pertinent part, that, "[t]he Bureau of Prisons under the direction of the Attorney General, shall . . . provide for the safekeeping, care, and subsistence of all persons charged with or convicted of offenses against the United States." Courts of Appeal have interpreted this statute as granting the BOP discretion in its implementation. "While it is true that this statute sets forth a mandatory duty of care, it does not, however, direct the manner by which the BOP must fulfill this duty. The statute sets forth no particular conduct the BOP personnel should engage in or avoid while attempting to fulfill their duty to protect inmates." Calderon v. United States, 123 F.3d 947 (7th Cir. 1997). See Carter v. United States, 2002 WL 32332081, *5 (D.S.C.), 57 Fed.Appx. 208 (4th Cir. Mar. 14, 2003)(citations omitted).

22

**2) The Intentional Tort Exception to FTCA Liability**

The intentional tort exception is codified in subsection (h) of the statute:

The provisions of this chapter and section 1346(b) of this title shall not apply to—(h) Any claim arising out of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with   contract rights: *Provided,* That, with regard to acts or omissions of investigative or law enforcement officers of the United States Government, the provisions of this chapter and section 1346(b) of this title shall apply to any claim arising, on or after the date of the enactment of this proviso, out of assault, battery, false imprisonment, false arrest, abuse of process, or malicious prosecution. For purposes of this subsection, 'investigative or law enforcement officers' means any officer of the United States who is empowered by law to execute searches, to seize evidence, or to make arrests for violations of Federal law.

28 U.S.C. § 2680.

Under the FTCA's intentional tort exception, the United States is not liable for the intentional torts of its employees unless those acts are committed by law enforcement officers of the United States. Correctional officers are considered "law enforcement officers" pursuant to 28 U.S.C. § 2680(h).  See Ortiz v. Pearson, 88 F.Supp.2d 151, 164 (S.D.N.Y. 2000). Accordingly, the FTCA waives sovereign immunity respecting alleged intentional torts committed by correctional officers; however, if "the actions underlying intentional tort allegations described in § 2680(h), [are] authorized and implemented consistent with federal law and the Constitution of the United States, [such actions] may be considered discretionary functions under § 2680(a), even if they would otherwise constitute actionable torts under state law." Medina v. United States, 259 F.3d at 225, *citing* Jackson, supra at 77 F.Supp.2d 714 ("The Court holds that a FTCA plaintiff must first overcome the discretionary function 'hurdle' before the Court will consider intentional tort claims under § 2680(h)."). Moreover, "[i]f a defendant can show that the tortious conduct involves a 'discretionary function,' a plaintiff cannot maintain an FTCA claim, even if the discretionary act

constitutes an intentional tort under § 2680(h)." <u>Gasho v. United States</u>, 39 F.3d 1420, 1435 (9th Cir. 1994).

Thus, a District Court considering whether the intentional tort exception bars an FTCA claim must determine if the Government's employees, in this case, the FCI Hazelton officers whom Plaintiff claims injured him, were performing a discretionary function at the time the alleged injuries occurred. If the Court determines that to be the case, the Government and its employees are immune from liability pursuant to the holdings in <u>Medina</u>, <u>Jackson</u>, and <u>Gasho</u>.

Here, the undersigned finds that the record does not support the Plaintiff's version of the events. Beyond unsupported conclusory allegations to the contrary in Plaintiff's admittedly verified complaint, Plaintiff has failed to present any evidence to overcome the Defendant's assertions regarding Plaintiff's continued resistance and threats after he assaulted Shreves and then refused to lie down; the copy of the Incident Report containing Shreve's contemporaneously-created statement made (long before litigation was at issue) that the Defendant produced; and the limited DVD video evidence produced, which indicates that the force and submission techniques applied on November 24, 2015 were applied in a good-faith effort to maintain or restore discipline, and not maliciously and sadistically to cause harm.  Plaintiff's conclusory allegations do not meet the "heightened pleading standard" required in actions against government officials. <u>See</u> <u>Randall v. United States</u>, 95 F.3d 339 (4th Cir. 1996); <u>see also</u> <u>Dunbar Corp. v. Lindsey</u>, 905 F.2d at 764. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment. <u>See</u> <u>Scott v. Harris</u>, 550 U.S. 372, 380, 127 S. Ct. 1769, 1776, 167 L. Ed. 2d 686, 694 (2007).

Accordingly, the undersigned finds that the decision to use force against Plaintiff on November 24, 2015 was an appropriate discretionary function, based on Plaintiff's violence toward Shreve and continued disruptive behavior in resisting and refusing to obey direct orders. This created a potentially volatile situation, interfering with the BOP's duty of care under 18 U.S.C. § 4042, to "provide for the safekeeping, care, and subsistence of all persons charged with or convicted of offenses against the United States." The statute sets forth no particular conduct that BOP personnel should engage in or avoid, while attempting to fulfil their duty to protect inmates. See Calderon, *supra* at 2002 WL 32332081, *5. Plaintiff's response to the Government's dispositive motion completely fails to establish that the Government's application of force, which may have inadvertently resulted in injury to him, was anything but discretionary. Instead, after admitting having provoked the incident by punching Shreves, he focuses on his minimizing his own responsibility for involvement in the incident and describing his alleged injuries. Because Plaintiff has not overcome the discretionary function hurdle, it is unnecessary to consider whether the intentional tort exception applies.

However, even if the undersigned were to perform an intentional tort exception analysis, Plaintiff's suit would still lack merit. The BOP employees identified by Plaintiff as the Government agents who injured him are correctional officers, and as such, they are subject to both the same liability and immunity which applies to law enforcement officers. Because the alleged intentional torts of those agents were implemented consistent with federal law and the Constitution, those actions may properly be considered discretionary functions. Accordingly, the undersigned finds that even if the actions of BOP correctional officers could have been considered intentional torts, which they clearly were not, because those actions were lawfully performed

25

consistent with federal law, the actions were discretionary functions, and the Government is thus immune from suit under the FTCA.

Moreover, there is absolutely no evidence, however, other than the Plaintiff's own unsupported, conclusory allegations which are woefully lacking in credibility and contradicted by the available record, to show that the FCI Hazelton staff had the necessary intent to commit an assault and battery upon him. Instead, the evidence shows that the use of force involved properly applied compliance techniques to gain quick control of an aggressive, disruptive, and noncompliant inmate, the use of which was reasonable under the circumstances.

Accordingly, because the District Court lacks subject matter jurisdiction and Plaintiff has failed to state a claim upon which relief can be granted, there is no genuine issue of material fact regarding Plaintiff's claims of assault and battery and they should be dismissed.

**E. Negligence**

Plaintiff also raises a claim of negligence arising out of the November 24, 2015 incident, asking the Court to find the Defendant liable for the barbaric actions or omissions negligently or intentionally committed by FCI Hazelton staff. ECF No. 1 at 8.

As noted *supra*, pursuant to the FTCA, the United State is liable in the same manner and to the same extent as a private individual under like circumstances in accordance with the law of the place where the act or omission occurred. 28 U.S.C. §§ 2674 and 1346(b)(1); Medina, 259 F.23d at 223. In West Virginia, in every action for damages resulting from injuries to the plaintiff alleged to have been inflicted by the negligence of the defendant, the plaintiff must establish three elements: (1) a duty which the defendant owes to him; (2) a negligent breach of that duty; and (3) injuries received thereby, resulting proximately from the breach of that duty. Webb v. Brown & Williamson Tobacco Co., 2 S.E.2d 898, 899 (W.Va. 1939).

Here, Plaintiff cannot establish that any duty of care owed to him was breached. Plaintiff alleges that, on November 24, 2015, after engaging in a "physical confrontation" with Counselor Shreves, Plaintiff was "handcuffed' and "then savagely beaten, kicked, in the face, head and all over [P]laintiff's body, for an extended period of time." ECF No. 1 at 6. Plaintiff asks that the Court "find the United States liable for the barbaric actions or omissions negligently or intentionally committed" by BOP employees. Id. at 8.

A careful review of the record reveals that on November 24, 2015, BOP staff at FCI Hazelton employed an immediate use of force and use of restraints to gain control of Plaintiff after he assaulted Counselor Shreves by punching him in the face with a closed fist, then repeatedly refused verbal commands to lie on the ground. After Shreves activated his body alarm to obtain assistance, responding BOP staff found Shreves covered in blood. Accordingly, BOP staff properly employed an immediate use of force by placing Plaintiff on the ground to control his aggressive and disruptive behavior. While on the ground, because Plaintiff continued to resist BOP staff and show signs of imminent violence by threating to assault staff, he was restrained, placed in an escort chair and transported to the SHU.

Based on the evidence, including Plaintiff's own admission that he instigated the incident by punching Shreves in the mouth; Shreve's statement in the Incident Report that Plaintiff entered his office "and without warning struck me in my mouth with a closed fist," and Plaintiff's continued resistance, threats, and disruptive behavior toward staff even while restrained, Plaintiff's negligence claim must fail. The BOP has a duty to exercise ordinary diligence to keep *all* prisoners, not only Plaintiff, safe and free from harm; the BOP staff's immediate use of force and use of restraints were necessary to gain control of Plaintiff based on *Plaintiff's own actions*. Defendant avers that only the amount of force necessary to gain control of Plaintiff was used. It is clear from

27

the evidence in the record that Defendant did not breach its duty to Plaintiff; on the contrary, officers used ordinary diligence to control the situation to keep Plaintiff and officers free from harm. Accordingly, the plaintiff has failed in his burden to establish a prima facie negligence claim against the Defendant arising out of the November 24, 2015 use of force, sufficient to entitle him to compensation under the FTCA.

## F. Implied Medical Negligence Claim

Finally, to the extent that the Plaintiff's FTCA claims can be construed to impliedly include a medical negligence claim for FCI Hazelton medical staff's failure to timely diagnose and/or adequately treat the injuries Plaintiff contends he actually received in the incident, such a claim is due to be dismissed, as well.

As an initial point, even a cursory review of the record refutes Plaintiff's claim that FCI Hazelton's medical staff never examined him at all after the incident, and that he was just parked in the SHU until he was transferred to FCI Cumberland. Attached to its dispositive motion, Defendant has produced a copy of an excerpt from Plaintiff's medical record showing that he was examined by one Brett Clark, RN, at 9:56 a.m. on November 24, 2015, just over two hours after Plaintiff punched Shreve. See BOP Health Services Clinical Encounter, ECF No. 38-4 at 6. Plaintiff did not report any symptoms to FCC Hazelton medical staff; rated his pain as zero (0); was alert and oriented; and had minimal injuries, consisting of superficial abrasions to his scalp, left eye, and a contusion behind his right ear. Id. FCC Hazelton medical staff observed no other injuries when they evaluated Plaintiff. Id. Plaintiff was directed to follow up at sick call as needed, and verbalized understanding. Id.

After Plaintiff's transfer to FCI Cumberland, a second injury assessment was conducted. Defendant contends that "Plaintiff reported symptoms to FCI Cumberland medical staff not

previously reported to medical staff at FCC Hazelton during his initial medical assessment." ECF No. 38, n.1 at 3. As for the more extensive injuries Plaintiff claims he actually sustained, but alleges were not discovered until FCI Cumberland's medical staff examined him and immediately sent him to the hospital, where he was kept and treated for "about 36 hours," a copy of Plaintiff's Inmate History, produced by the Defendant, shows that the trip to the hospital in Cumberland, Maryland encompassed a total time period of less than 24 hours, not even including travel time there and back; Plaintiff left FCI Cumberland at 3:24 p.m. on November 24, 2015 and was back by 2:44 p.m. the next day. See ECF No. 38-1 at 11 – 12.

Finally, Plaintiff's descriptions regarding the true extent of his claimed injuries changes, depending on which document he describes them in: his July 8, 2017 administrative tort claim avers that he sustained "broken ribs and fractured bones in his right eye from being hit "by the work boots[,]"  fractures that are "now by this point set where they lay broken [and] will have to be re-broken and re-set in their natural formation . . . I pray they can be repaired after such a long period of time. I fear that I will never be normal physically or mentally ever again[.]" ECF No. 11-1 at 5. He also asserted that a CT scan revealed "fractures of the seventh and . . . eight[h] ribs . . . tiny left apical pacumothorax [sic] . . . there might be mild corneal abrasions noted as well (right eye) . . . ankle sprain . . . blurre[d] vision (right eye) . . . partially conscious . . . a tiny left pleural effusion . . . [and] chest discomfort ("high blood pressure"). Id. at 5 - 6. In his April 20, 2018 complaint, he avers that he suffered two fractured ribs, head trauma, swelling in his face and ear with bruises, and a right eye hemorrhage. ECF No. 1 at 6. Finally, his November 25, 2019 response in opposition asserts that he has had "multiple operations" to repair his "shattered" eye socket,[10]

---

[10] Plaintiff does not specify which eye socket he references.

29

had "damage done to . . . [his] ribs," internal pain on kidness [sic], stomach and ribs and a possible concussion caused by repeated kicks to the head," and psychological damage. ECF No. 50 at 2, 4.

As there are no medical records beyond the copy of the single November 24, 2015 exam done at FCI Hazelton before the undersigned for review, none of these varying claims can be confirmed.

Nonetheless, to establish a medical negligence claim in West Virginia, the plaintiff must prove:

> (a) the health care provider failed to exercise that degree of care, skill, and learning required or expected of a reasonable, prudent health care provider in the profession or class to which the health care provider belongs acting in the same or similar circumstances; and (b) such failure was a proximate cause of the injury or death.

W.Va. Code § 55-7B-3.

When a medical negligence claim involves an assessment of whether the plaintiff was properly diagnosed and treated and/or whether the health care provider was the proximate cause of the plaintiff's injuries, expert testimony is required. Banfi v. American Hospital for Rehabilitation, 529 S.E.2d 600, 605-606 (W.Va. 2000).

Additionally, under West Virginia law, certain requirements generally must be met before a health care provider may be sued. W.Va. Code §55-7B-6.  This section provides in pertinent part:

> **§ 55-7B-6. Prerequisites for filing an action against a health care provider; procedures; sanctions**
>
> (a) Notwithstanding any other provision of this code, no person may file a medical professional liability action against any health care provider without     complying with the provisions of this section.
>
> (b) At least thirty days prior to the filing of a medical professional liability action against a health care provider, the claimant shall serve by certified mail, return receipt requested, a notice of claim on each health care provider the claimant will join in litigation. The notice of claim shall include a statement of the theory or theories of liability upon which a cause of action may be based, and a list of all health care providers and health care facilities to whom notices of claim are being sent, together with a screening certificate of merit. The screening certificate of

merit shall be executed under oath by a health care provider qualified as an expert under the West Virginia rules of evidence and shall state with particularity:

(1)   The expert's familiarity with the applicable standard of care at issue;

(2)   the expert's qualifications; (3) the expert's opinion as to how the applicable standard of care was breached; and (4) the expert's opinion as to how the breach of the applicable standard of care resulted in injury or death. A separate screening certificate of merit must be provided for each health care provider against whom a claim is asserted. The person signing the screening certificate of merit shall have no financial interest in the underlying claim, but may participate as an expert witness in any judicial proceeding. Nothing in this subsection may be construed to limit the application of rule 15 of the rules of civil procedure.

This Court has previously held that compliance with W.Va. Code §55-7B-6 is mandatory prior to filing suit in federal court. See Stanley v. United States, 321 F.Supp.2d 805, 806-807 (N.D. W.Va. 2004); see also Starns v. United States, 923 F.3d 34 (4th Cir. 1991) (holding that West Virginia's medical malpractice liability cap applies to claims brought against the United States under the FTCA).

The Supreme Court of Appeals of West Virginia has clarified that: "[t]he requirement of a pre-suit notice of claim and screening certificate of merit is not intended to restrict or deny citizens' access to the court." Hinchman v. Gillette, 217 W.Va. 378, 618 S.E.2d 387, 394 (2005). Rather, "in determining whether a notice of claim and certificate are legally sufficient, a reviewing court should apply [§ 55-7B- 6] in light of the statutory purposes of preventing the making and filing of frivolous medical malpractice claims and lawsuits and promoting the pre-trial resolution of non-frivolous medical malpractice claims." Id. at 395. The appropriate inquiry is whether the plaintiff "has demonstrated a good faith and reasonable effort to further the statutory purposes." Id.

Here, although Plaintiff's administrative tort claim did enumerate a list of injuries, he did not specify that he was raising any medical negligence or malpractice allegation in his

31

administrative tort claim. Instead, as previously noted, he alleged that he had suffered cruel and unusual punishment when the BOP staff "assaulted" him and "brutally" beat him. ECF No. 11-1 at 2. Accordingly, the administrative claim did not provide the BOP with notice from which to investigate, analyze and potentially resolve a prospective medical negligence or malpractice claim, and therefore, his administrative tort claim fails to satisfy the pre-suit notice of claim required under West Virginia law.

Furthermore, the adequacy of medical care following the use of force generally requires expert testimony. See Lancaster v. USP Hazelton, 3:16cv30, 2017 WL 2448187 *4 (N.D. W.Va. Aug. 11, 2017) (Where inmate did not claim that he was denied medical attention altogether, but rather, that he was denied adequate medical attention following a use of force, expert testimony was required and therefore, a screening certificate of merit was also required). The Plaintiff has not presented a screening certificate of merit nor has he provided any explanation why he should not have to comply with this mandatory requirement.

**G. Plaintiff's Requests for Relief**

Plaintiff's request for relief in his complaint included a request for pre- and post-judgment interest. As for Plaintiff's request for pre-judgment interest, the undersigned notes that 28 U.S.C. § 2674 provides as follows:

> The United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances, **but shall not be liable for interest prior to judgment** or for punitive damages.

28 U.S.C. § 2674 (emphasis added). Because this Court does not have the authority to entertain Plaintiff's demand for pre-judgment interest, the Plaintiff's claim for the same has no chance for success.

32

As for Plaintiff's new requests for relief in his response in opposition for compensatory and punitive damages in the amount of $250,000.00 "jointly and severally" from "each defendant," to the extent that the plaintiff attempts to sue the individual federal defendants under the FTCA, those claims must be dismissed.  The only proper defendant under the FTCA is the United States. As for Plaintiff's request for punitive damages, he is reminded that 28 U.S.C. § 2674 provides as follows:

> The United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances, **but shall not be liable for** interest prior to judgment or for **punitive damages.**

28 U.S.C. § 2674 (emphasis added). Therefore, even if Plaintiff's claims had merit, this Court does not have the authority to entertain Plaintiff's demand for punitive damages.

As for Plaintiff's claim for injunctive relief, because Plaintiff is proceeding under the FTCA, relief is limited to money damages; equitable relief is not available under the FTCA. Peck v. Blessing, 2006 WL 213736 (N.D. Cal.); Ajaj v.United States, 479 F.Supp. 501 (D.S.C. 2007).

Further, pursuant to 28 U.S.C. § 2675(b), except in circumstances not present here, a Plaintiff seeking damages under the FTCA is limited to the amount previously requested in his administrative tort claim. Finally, as for Plaintiff's request for relief in his response in opposition for a jury trial, 28 U.S.C. § 2402 (actions against the United States under § 1346 shall be tried by the court without a jury)).

## V. Recommendation

For the foregoing reasons, the undersigned **RECOMMENDS** that Defendants' Motion to Dismiss, or in the Alternative, Motion for Summary Judgment [ECF No. 37] be **GRANTED** and Plaintiff's Complaint [ECF No. 1] be **DENIED** and **DISMISSED with prejudice.**

The parties are notified that this Report and Recommendation is hereby **FILED**, and a copy will be submitted to United States District Judge Thomas S. Kleeh.  Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), Rules 6(d) and 72(b), Federal Rules of Civil Procedure, and Rules 1(b) and 8(b) of the Rules Governing Proceedings in the United States District Courts Under Section 2254 of Title 28, United States Code, **any party shall have fourteen days from the date of service of this Report and Recommendation within which to file with the Clerk of this Court**, **specific written objections, identifying the portions of the Report and Recommendation to which objection is made, and the basis of such objection.**  Objections shall not exceed ten (10) typewritten pages or twenty (20) handwritten pages, including exhibits, unless accompanied by a motion for leave to exceed the page limitations, consistent with LR PL P 12. Extension of this time period may be granted by the presiding District Judge for good cause shown.

**Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals.** Snyder v. Ridenour, 889 F.2d 1363 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984).  A copy of such objections shall be served on Judge Kleeh.

The Clerk is directed to mail a copy of this Report and Recommendation to the *pro se* plaintiff by certified mail, return receipt requested, to his last known address as shown on the docket, and to transmit a copy electronically to all counsel of record.

Upon entry of this Report and Recommendation, the clerk of court is **DIRECTED** to terminate the Magistrate Judge association with this case.

DATED: December 19, 2019

34

/s/ *Michael John Aloi*
MICHAEL JOHN ALOI
UNITED STATES MAGISTRATE JUDGE